ORIGINAL FILED
JAN 25 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
E-filing

LOCKE LORD LLP
Regina J. McClendon (SBN 184669)
rmcclendon@lockelord.com
44 Montgomery Street, Suite 2400
San Francisco, CA 94104
Telephone: (415) 318-8810
Fax: (415) 676-5816

BERG & ANDROPHY
David H. Berg (Texas Bar No. 02187000—*pro hac vice* application to be filed)
Christopher L. Gadoury (Texas Bar No. 24034448—*pro hac vice* application to be filed)
3704 Travis
Houston, Texas 77002
Telephone: (713) 529-5622
Fax: (713) 529-3785

Attorneys for Plaintiff
HACIENDA MANAGEMENT, S. DE R.L. DE C.V.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MEJ

| | |
|---|---|
| HACIENDA MANAGEMENT, S. DE R.L. DE C.V.,<br><br>Plaintiff,<br><br>vs.<br><br>STARWOOD CAPITAL GROUP GLOBAL I, LLC, STARWOOD GLOBAL OPPORTUNITY FUND VI-A, STARWOOD GLOBAL OPPORTUNITY FUND VI-B, SOF-VI MANAGEMENT, LLC, and STARWOOD CAPITAL GROUP MANAGEMENT, LLC,<br><br>Defendants. | CV 12 CASE NO. 0395<br><br>**PLAINTIFF'S COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Hacienda Management, S. De R.L. De C.V. ("Hacienda") files this Complaint against Defendants Starwood Capital Group Global I, LLC, Starwood Global Opportunity Fund VI-A

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

FAXED

("Fund A"), Starwood Global Opportunity Fund VI-B ("Fund B"), SOF-VI Management, LLC, and Starwood Capital Group Management, LLC, (collectively "Starwood") and alleges the following:

## PARTIES

1. Hacienda is a Mexican company with its principal place of business in Cabo San Lucas, Baja California Sur, Mexico.

2. Starwood Capital Group Global I, LLC is a Connecticut limited liability company with its principal place of business in Greenwich, Connecticut. Starwood Capital Group Global I, LLC is registered to conduct business in California and maintains offices at 100 Pine Street, Suite 3000, San Francisco, California 94111. Starwood may be served with process by serving its registered agent for service of process, CT Corporation System, 818 W. 7th St., Suite 200, Los Angeles, CA, 90017-3425. Starwood Capital Group Global I, LLC is the managing member of SOF-VI Management, LLC and manages Fund A and Fund B. Starwood Capital Group Global I, LLC employs the agents that committed the acts forming the basis of this lawsuit.

3. Fund A is a Delaware limited partnership with its principal place of business in Greenwich, Connecticut. Fund A may be served with process by serving its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. Fund A is an affiliate of the beneficiary of the trust that owns the property that Hacienda contracted to manage. Fund A also guaranteed the construction loan used to build the property.

4. Fund B is a Delaware limited partnership with its principal place of business in Greenwich, Connecticut. Fund A may be served with process by serving its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. Fund B is an affiliate of the beneficiary of the trust that owns the property

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

that Hacienda contracted to manage. Fund B also guaranteed the construction loan used to build the property.

5. SOF-VI Management, LLC is a Delaware limited liability company with its principal place of business in Greenwich, Connecticut. SOF-VI Management, LLC may be served with process by serving its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. SOF-VI Management, LLC is the general partner of Fund A and Fund B.

6. Starwood Capital Group Management, LLC is a Connecticut limited liability company with its principal place of business in Greenwich, Connecticut and may be served with process by serving its registered agent for service of process, Ellis F. Rinaldi, Rinaldi, Finkelstein & Franklin, 591 W Putnam Ave., Greenwich, CT 06830-6005. Starwood Capital Group Management, LLC employs the agents that committed the acts forming the basis of this lawsuit.

## JURISDICTION

7. This Court has subject matter jurisdiction in this civil action pursuant to 28 U.S.C § 1332(a)(2) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the action is between a citizen of a foreign state and citizens of a U.S. state.

8. This Court has personal jurisdiction over the defendants because the defendants have engaged in continuous and systematic activities within the State of California, including, but not limited to, maintaining an office and owning and/or managing real property and related investments within the State of California.

## VENUE AND INTRADISTRICT ASSIGNMENT

9. Venue is proper in the Northern District of California, pursuant to 28 U.S.C. § 1391(a)(3), because Starwood Capital Group Global I, LLC, located at 100 Pine Street, Suite 3000,

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

San Francisco, California 94111, is subject to personal jurisdiction in California. Pursuant to Civil L.R. 3-2(c), this case is properly assigned to the San Francisco or Oakland division.

## FACTUAL BACKGROUND

### I. The Origin of the Hacienda Beach Club and Residences Project.

10. This case concerns Starwood's intentional, unlawful interference with Hacienda's contract to manage a luxury residential development property in Cabo San Lucas, Baja California Sur, Mexico known as the Hacienda Beach Club and Residences (the "Project"). The Project was the brainchild of Koll Company and its founder, Don Koll, who was the original driving force of resort and luxury residential development in Cabo San Lucas. Koll envisioned building a luxury residential development in the heart of Cabo San Lucas, as opposed to other developments that were secluded and located miles from the city center.

11. In 2005, Mr. Koll invited Hacienda's affiliates, Del Mar Development ("DMD") and Del Mar Management ("DMM"), to become involved in the Project by providing property management services because of DMD's and DMM's expertise and reputation in building, owning, and running the Villas Del Mar ("VDM") luxury residential community in Cabo San Lucas. VDM was/is considered the gold standard in luxury residential communities in Mexico, and the Project was heavily promoted and sold using the VDM name/reputation.

12. With Koll as the developer and Hacienda as the property manager, Starwood was brought in to provide financing. The Project is owned by a Mexican trust called Desarrollo Turistico S/K Cabo San Lucas Holding F/014. The beneficiary of the Desarrollo trust, S/K Cabo San Lucas Holdings LLC, was originally jointly owned by Starwood Hacienda LLC – an affiliate of Starwood – and a joint venture between Koll and Hacienda.[1] Fund A and Fund B invested in Starwood Hacienda LLC and guaranteed a $130.5 million construction loan made by Wachovia to Desarrollo.

[1] Starwood Hacienda LLC originally owned 93% of S/K Cabo San Lucas Holdings, LLC but now owns 100% as a result of Koll and Hacienda declining to participate in subsequent capital calls.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

Starwood Capital Group employees, including executives at the highest levels of management, engaged in the tortious acts described below.

**II. The Project is marketed based on VDM's reputation and expertise.**

13. From the outset, the Project was marketed based on VDM's reputation and brand recognition for luxury and quality. For example, IMI, the sales company hired by Desarrollo to market and sell the homes in the Project, was sent to VDM for training since it had been decided since as early as 2005 that Hacienda and its affiliates would manage/operate the Project and that "the [P]roject will have the same services as those provided at the VDM." In December 2005, Desarrollo wrote to potential homeowners that "[o]ur partners include Del Mar Development, the visionaries behind the prestigious community of Villas Del Mar at Palmilla. They will provide world-class property management services to our new community offering homeowners and guests the highest service standards in the industry."

14. Likewise, the sales book used to market and promote the Project proclaimed unequivocally that "Five-star services will be provided by Del Mar Management, renowned for their Villas Del Mar community." And the purchaser's information guide -- provided to serious potential purchasers who were ready to start looking at legal documents -- stated under the frequently asked questions section:

> Q: Why is Del Mar Management the Property Manager?
>
> A: In order to ensure worry-free ownership and high service levels, consistency of delivery with quality staff and contractors is essential. ... Del Mar Management has a proven record in Los Cabos as the leader in providing this quality of service to its clientele.

15. Desarrollo also exploited Hacienda and its affiliate, VDM, to Desarrollo's bankers. In September 2006, Koll Company wrote to HM that "upon arrival [in Los Cabos of the bankers who

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

were financing the construction of the Project] we would like to bring them to Villas Del Mar for a site visit to see examples of your Villas and then give them the opportunity to ask questions and discuss the amenities as well as services offered by Del Mar Management."

16. These marketing efforts using VDM's and DMM's reputation and expertise were quite successful. By early 2008, the majority of units in the first phase of the Project had been pre-sold and pre-sales of units in phase II of the Project had begun. In fact, by July 2008, 96 of the 109 phase I units were under contract to be sold, representing well over $200 million in sales, with Desarrollo receiving approximately $50 million in unit sales deposits for the Project.

**III. From the outset, Starwood wages a campaign of interference with Hacienda's contractual relationship with Desarrollo, including breaching an exclusivity provision.**

17. As the Project moved towards a November 2008 opening date, Desarrollo and Hacienda (through an affiliate) executed the Property Management and Rental Management Term Sheet – Dated May 14, 2008.[2] The Term Sheet provided the essential terms of a subsequent agreement between Desarrollo and Hacienda under which Hacienda would manage and operate the Project for, at minimum, a base management fee of $50,000 per month.[3] Among other things, the parties agreed in the Term Sheet "to negotiate exclusively with one another for a period of 90 days following the date hereof in an effort to finalize the other aspects of their agreement related to the matters described in this term[ ] sheet, and . . . to negotiate in good faith."[4] As discussed below, Starwood's subsequent intervening actions were anything but in good faith.

18. The global economy started to seriously contract in the summer of 2008, causing significant decreases in tourism across the board, including in the Mexican tourism industry. In

---

[2] *See* Exhibit 1.

[3] *See id.* ¶ IV(b).

[4] *See id.* ¶ X.

addition to these financial headwinds, and the Mexican swine flu epidemic, by letter dated July 9, 2008, Wachovia, Desarrollo's construction lender, informed Starwood of a $31 million deficiency on Desarrollo's construction loan, which was guaranteed by Fund A and Fund B. Understandably, Starwood became concerned about the impact that the deteriorating market conditions would have on their investment in the Project and looked for ways to start cutting costs.

19. However, instead of being up front with Hacienda and jointly working to address the financial challenges faced by the Project, Starwood secretly started negotiating with other, less costly, property management companies, in flagrant disregard of the exclusivity provision in the Term Sheet.

20. In a June 16, 2008 email, Daniel Schwaegler, Starwood's Senior Vice-President for Asset Management, wrote to Jerry Yahr of Koll raising the issue of the "current market conditions," explaining that "the buyer markets and the financing markets have been rapidly shifting and we need to constantly assess how we can ensure success at [the Project] in light of the headwinds."[5] In addition, Schwaegler also contemplated "what our alternatives may be for a different operator."[6] At all relevant times, Schwaegler was an employee of Starwood Capital Group, located in San Francisco, California, and committed most of the acts alleged from his office in San Francisco, California.

21. Similarly, two weeks later, on June 30, 2008, Starwood Vice-President for Sales, Carrie Hiltscher, wrote to Schwaegler discussing the "slowdown in the market place" and the "rise in construction costs" as challenges facing the Project.[7] Hiltscher also mentioned as an additional

[5] *See* Exhibit 2. The documents cited throughout this Complaint were obtained during the course of discovery in the arbitration proceeding between Hacienda and Desarrollo discussed in Paragraph 61, *infra*.

[6] *See id.*

[7] *See* Exhibit 3.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

challenge that Starwood needed to "look at replacing the existing operations management company."[8]

22. Subsequently, on July 1, 2008, Schwaegler forwarded his earlier Koll email of June 16th to Jeffrey Dishner, Starwood's Senior Managing Director, and advised Dishner that he thought it was best to stop negotiating with Ron Hatfield, a principal of Hacienda, and that Starwood needed to "go out to market for [an] unbranded operator."[9] But Schwaegler also acknowledged that Starwood needed Hatfield's construction management services.[10]

23. One week later, on July 9, 2008, Schwaegler emailed Dishner, stating that "[r]egarding operations, we will need to find a new operator. . . I'll just need some rolodex help in finding a backup."[11] Underscoring the fact that Starwood's efforts in interfering with Hacienda's contract with Desarrollo were solely related to cutting costs rather than any performance issues, Schwaegler informed Dishner, "Just so you understand our dynamics and biggest risks, the most important team in place for completing Phase I is Hatfield's [i.e. Hacienda's] on site team."[12]

24. Schwaegler next emailed Dishner on July 12, 2008, stating that "[i]n case we don't come to agreement with Hatfield on operations, I have the following companies and action steps in mind."[13] Schwaegler then listed Troon and Brandco as two management companies for Starwood to approach and acknowledged that he expected to "have some suggestions from our consultant early next week," referring to Tom Morone, a consultant that Starwood engaged to seek out new operators

---

[8] *See id.*

[9] *See* Exhibit 2.

[10] *See id.*

[11] *See* Exhibit 4.

[12] *See id.*

[13] *See* Exhibit 5.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

during the exclusivity period.[14] Further, Schwaegler asked Dishner whether there were any other companies that "you or Barry are talking to or want me to call," indicating that Starwood founder, Chairman, and Chief Executive Officer Barry Sternlicht was now involved in Starwood's interference.[15] Dishner replied to Schwaegler that he "should call John Scott from Rosewood."[16]

25. Starwood then commenced discussions with Troon, Brandco, and Rosewood, as Schwaegler indicated in a July 16, 2008 email to Dishner and Jeff Morris, Starwood's Senior Vice-President and Director of Development and Construction.[17] In this email, Schwaegler sought to set up a conference call to discuss, among other things, "preliminary feedback from the three potential operators I am talking with (internal Brandco, Troon, and Rosewood)."[18]

26. Thereafter, Starwood clearly continued negotiations with Troon and Brandco because, on July 18, 2008, Schwaegler emailed Dishner to update him with specific negotiation points and issues regarding these two entities, but not before expressly acknowledging the exclusivity provision that had clearly been violated, stating that "we are technically in an exclusive negotiation period with Hatfield."[19] On the subject of Brandco, Schwaegler informed Dishner that Neil Jacobs, Starwood's President of Global Hotel Operations, would discuss the issues with him or Barry Sternlicht and that Neil "would need to hear that Barry is supportive of it."[20]

27. On July 29, 2008, Schwaegler, well within the exclusivity period, once again emailed Dishner, stating that "[b]ased on our call last week I have started the process to go a different route

[14] *See id.*

[15] *See id.*

[16] *See id.*

[17] *See* Exhibit 6.

[18] *See id.*

[19] *See* Exhibit 7.

[20] *See id.*

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

than VDM" and that Starwood would "work with [its] hotel consultant to quickly reach out to several operators."[21] Schwaegler also informed Dishner that "we are working on communications strategy with Hatfield. In order to keep him motivated on closing units from the CM side, we will explain the issues of why this isn't going to work and I'll probably go see him next week to talk him through this. At the end of the day, I'm going to try to give him the opportunity to make it look like it was his decision that it wasn't the right fit so he can save a little face in the marketplace (small town)." In reality, Schwaegler never had any such conversation with Hatfield or otherwise informed him that Starwood was engaged in negotiations with other operators. Schwaegler concluded the email by stating, "I just want to confirm before I set this final piece in motion, that this is still the direction we'd like to go."[22]

28. That same day, July 29, 2008, Schwaegler also emailed Bill Hall, the principal of OAC Consulting of San Diego, California and a Starwood construction consultant on the Project, copying Morris, Starwood's Senior Vice-President and Director of Development and Construction, to inform Hall that Starwood's hotel consultant was to "work immediately on finding a compatible operator (we may not be able to directly contact operators . . . as we are still under exclusivity w/ VDM)."[23] Schwaegler also notified Hall of Starwood's "communication strategy" with Hatfield, stating that "[t]his is the difficult one and given the importance of [Hatfield] on the [construction management] side, my thinking is that this is done personally in Cabo by myself and Jerry next week. . . . One of the items that I will propose to [Hatfield] is to pay him an ongoing consulting fee to assist Ownership and new Operator through [the] transition period. [Hatfield] may tell me to go to

[21] *See* Exhibit 8.

[22] *See id.*

[23] *See* Exhibit 9.

hell, but worth asking."[24] Again, no such meeting or conversation happened between Schwaegler and Hatfield. Schwaegler continued, "Until we have the communication strategy down and have discussed everything with [Hatfield], any [operations] work that includes VDM should continue."[25]

29. The next day, on July 30, 2008, Schwaegler emailed Dishner with a list of eight "potential operators" from their hotel consultant, as well as three additional potential operators that Schwaegler separately proposed.[26] Schwaegler also informed Dishner that he was "confirmed for meeting next Tuesday morning with Ron Hatfield to cut him loose."[27] Again, no such meeting ever occurred.

30. The lengths to which Starwood had gone in negotiating with other operators, as well as the extent of Hacienda's duties and responsibilities on the Project, are further highlighted by a detailed, six-page Request for Proposal that Morone prepared and sent to potential replacement operators.[28] Morone's July 21, 2008 email to Schwaegler attaching the Request for Proposal acknowledged the extensive responsibilities expected of the new manager in a short time frame and ultimately concluded, "Bottom line – we need VDM's cooperation badly."[29]

31. Subsequently, on August 1, 2008, Schwaegler forwarded the Request for Proposal to Jacobs and told Jacobs that he was to meet "with Ron Hatfield on Tuesday morning to give him the news that we are moving in a different direction" and that that his goal was to "first protect our relationship with [Hatfield] such that he continues to perform the construction management

[24] *See id.*

[25] *See id.*

[26] *See* Exhibit 10.

[27] *See id.*

[28] *See* Exhibit 11.

[29] *See id.*

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

responsibilities to the best of his abilities."[30] Thus, Starwood yet again internally acknowledged the importance of Hatfield and Hacienda to the Project.

32. Similarly, if Schwaegler's internal discussions are to be believed, it is clear that Starwood's decision to change operators was motivated solely by its concern with the economic conditions rather than any deficiency in Hacienda's services provided. In an August 3, 2008 email, Schwaegler emailed Jerry Yahr of Koll and Morone with an explanation that Schwaegler intended to convey to Hatfield: "The world has changed and Starwood has a grave concern about the global health of this asset over the long run. Thus we feel we need to move this asset towards a hotel/condo-hotel paradigm instead of just a high-end residential concierge program that our original underwriting entailed." Schwaegler's email was honest: it was the economy and not Hacienda management that caused his "grave concern."

**IV. Starwood decides to (temporarily) keep Hacienda on the Project after concluding that changing operators would result in a "buyer's revolt;" Desarrollo, with Starwood's active participation, fraudulently induces Hacienda to enter into a Management Agreement.**

33. Ultimately, Starwood concluded that, at least for the time being, changing operators would have a devastating effect on the Project because, as yet, none of the units under construction had been closed. On August 8, 2008, Dishner emailed Sternlicht with the realization that "if we lose Hatfield we will really jeopardize our closings. IMI says we are crazy to risk it. I'd rather not risk it in this market."[31] Indeed, Dishner was not the only Starwood executive to recognize the importance of Hacienda to the Project, as Morris had previously expressed to Schwaegler that Starwood may

[30] *See id.*

[31] *See* Exhibit 12.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

have "sold the operations at Villas Del Mar as the standard and some buyers may revolt" if Starwood changed operators.[32]

34. Therefore, in the face of significant economic headwinds, Starwood decided to stick with Hacienda for the time being to maximize closings on the contracts it had in place. Having already knowingly and intentionally caused the breach of the Term Sheet's exclusivity provision, Starwood then proceeded to negotiate, and ultimately enter into, a Management Agreement with no intention of allowing Hacienda to receive the base fee of $50,000 per month throughout the term of the contract. That is, Starwood negotiated and executed the Management Agreement with the intent to ultimately interfere with Hacienda's contract by causing Hacienda's termination once Starwood sufficiently reaped its own benefits under the contract. As Schwaegler advised Dishner and Jacobs, Hacienda's management fees would "need to be managed through our budget approval and termination rights."[33] Sternlicht himself agreed with this approach, separately writing to Dishner that "it's a crazy contract, but we were willing to do it as insurance to get buyers to close."[34]

35. Despite all of this, during the course of contract negotiations, Schwaegler had the audacity to represent to Hatfield, in a November 12, 2008 email, that Desarrollo/Starwood was acting in "good faith."[35] Eight days later, Schwaegler emailed Hatfield again, representing that Desarrollo was fully committed to Hacienda, stating "We are prepared to move forward with the [management] agreement and guaranty in their current form. Barry would still like to connect with you at a mutually convenient time when he returns from his travels, but we all feel that we need to keep everyone's focus 100% moving forward and so we are prepared to execute the management

[32] *See* Exhibit 13.

[33] *See* Exhibit 14.

[34] *See* Exhibit 15.

[35] *See* Exhibit 16.

agreement and guaranty now."[36] Relying on Schwaegler's commitment to the Management Agreement and the Project, Hatfield replied, "Dan, this is great."[37]

36. The representations that Desarrollo/Starwood were acting in good faith and were committed to the Project and the Management Agreement induced Hacienda, who had no idea of Starwood's subterfuge that was going on behind the scenes, to enter into a Management Agreement with Desarrollo. The truth was that Desarrollo had no intention of performing under the Management Agreement and that Starwood had no intention of allowing Hacienda's contract rights to go undisturbed. Had Hacienda known the truth, it never would have entered into the Management Agreement.

**V. Desarrollo, with Starwood's active participation, fraudulently induces Hacienda to enter into a twenty year Management Agreement. Just three months later, Starwood devises a "transition plan" to remove Hacienda.**

37. Based on the facts that: (1) Desarrollo had consistently marketed and sold the Project for years based on the reputation of VDM and under the premise that Hacienda and its affiliates would manage and operate the Project, and (2) Starwood determined that Hacienda's management of the Project was its best option at ensuring that the $200 million plus in pending sales were closed, on December 5, 2008 Hacienda entered into a twenty-year Management Agreement with Desarrollo, governed under California law, that provided that Hacienda was to manage and operate the Project for a base fee of $50,000 per month and an incentive fee based on profits.[38]

---

[36] *See* Exhibit 17.

[37] *See id.*

[38] *See* Exhibit 18, §§2.2.1 2.2.2, 4.1, 1.1, 17.2. The Management Agreement provides for an initial term of 15 years with an optional 5 year extension at Hacienda's sole discretion.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

38. Alas, the global economic crisis, along with Mexican drug violence and the swine flu (which effectively brought tourism to Mexico to a complete halt by late spring 2009), proved to be too much to overcome, despite Desarrollo holding 20% deposits on the 95 pre-sold units. And although the Project ostensibly opened on November 17, 2008, by January 2009, not a single unit at the Project had been closed. In fact, by the end of 2009, Desarrollo had closed only 27 of the 109 phase I units, despite the amazing pre-sale success.

39. As it began to become apparent in 2009 that the closing of most of the pre-sold units was not going to happen, Starwood again began scheming to find a way for Desarrollo to escape its obligations with Hacienda. But rather than considering potential legitimate methods, Starwood, at the highest levels of management, chose to tortiously interfere with Hacienda's contract by means of deception and knowingly wrongful conduct.

40. As early as March 2009, Starwood was already planning to replace Hacienda in violation of the Management Agreement – which had been heavily negotiated with respect to a special termination provision that allowed Desarrollo to terminate based on the Project not achieving its projected gross operating profit for two out of three consecutive years starting in 2010.[39] And rather than honestly discuss any ways to reduce the amount of Hacienda's monthly fees in a mutually agreeable manner, Starwood instead began to hatch plans to induce Desarrollo to breach its contract with Hacienda by means of trickery and deceit. Schwaegler once again enlisted Starwood consultant Hall's services – this time requesting Hall to "prepare a program" in which Starwood would operate and manage the Project entirely in-house, without Hacienda and Koll.[40] On March 22, 2009, Hall submitted a report to Schwaegler replete with references to terminating Hacienda, stating that "[s]tarting now, and going forward, Starwood has the opportunity to regain total daily

[39] *See* Exhibit 18, § 12.1.

[40] *See* Exhibit 19.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

control of the development by removing the general partner and placing appropriate infrastructure to manage and oversee the asset in house."[41] Hall further provided budgets that contemplated "a transition in April 2009 . . . from a Koll/VDM operation to a Starwood operation."[42]

41. Starwood then proceeded with the "transition," as contemplated by Hall and Schwaegler. An April 2009 email string between Hiltscher, Schwaegler and other Starwood executives refers to Hiltscher focusing her time on the "transition plan," while a discussion ensues on the "Cabo tourism industry . . . getting hammered" due to the swine flu outbreak.[43] Schwaegler also instructs Hiltscher to account for the "financial catastrophe and credit market freeze" in her projections, in addition to epidemic outbreaks.[44] Once again, there is no discussion attributing the reason for the "transition plan" to any deficiency on the part of Hacienda.

42. In large part due to the financial catastrophe and swine flu's impact on the Cabo tourism industry, Starwood's construction loan with Wachovia remained in default throughout this time period. As a result, Starwood and Wachovia held quarterly discussions regarding the Project. On July 21, 2009, a Wachovia vice-president emailed Schwaegler with an agenda for an update call to be held on July 23rd.[45] Notably, the very first item for discussion was the "change-over in property management."[46] The other discussion items all referred to financial issues with the Project

---

[41] *See id.*

[42] *See id.*

[43] *See* Exhibit 20.

[44] *See id.*

[45] *See* Exhibit 21.

[46] *See id.*

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

with nothing mentioned about any operational shortcomings on the part of Hacienda.[47] Thus, Starwood was progressing with its "transition plan" with the knowledge and approval of Wachovia.

**VI. Starwood uses the Keys report as a pretext to change General Managers and "elegantly remove" Hacienda.**

43. Next, Starwood enlisted the services of yet another consultant to assist in carrying out the "transition plan": this time, a former Four Seasons executive named Duffy Keys. Keys, a California resident, is the principal of Keys Associates, which is located in Rancho Santa Fe, California. Keys was ostensibly hired to assist all parties in finding ways to improve the Project. Or at least that was what Keys and Schwaegler falsely represented to Hatfield in verbal conversations in November 2009. But, once again, Starwood was being deceptive. To use Schwaegler's own words from a November 2009 email to Keys, the truth is that Schwaegler specifically "tasked [Keys] with the goal of reducing [Hatfield's] scope and fee in a helpful way."[48] Similarly, Hiltscher described Keys's job to a Starwood consultant as "making recommendations on the management company, i.e. the bad guy."[49] And just 25 days before Hacienda was summarily terminated, Schwaegler described Keys to McCarthy as "our consultant helping with the transition of Hacienda operations from Del Mar Management to Ricardo."[50] Clearly, there is a vast difference between making recommendations on how to improve the Project as a whole – as was represented to Hacienda – versus making recommendations to aid in terminating Hacienda – as was what actually happened. Thus, given the task at hand, it should come as no surprise that Keys subsequently issued a

---

[47] *See id.*

[48] *See* Exhibit 22.

[49] *See* Exhibit 23.

[50] *See* Exhibit 31.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

pretextual report, on October 10, 2009, that contained various perceived deficiencies that were either not valid or, if technically true, did not have any material adverse impact on the Project.[51]

44. Schwaegler then used Keys's report to justify the next step of the transition plan – the removal of the Project's General Manager, who was required to be instructed and supervised by Hacienda under Section 3.7.1 of the Management Agreement. On October 22, 2009, less than two weeks after Keys issued his report, Schwaegler emailed Managing Director and Head of Asset Management McCarthy the Keys report, using it to justify Schwaegler's conclusions that Starwood needed to "attempt an elegant removal of [Hatfield] as manager. Finding our own GM is the first step in this process."[52] Thus, despite Starwood's express knowledge that the General Manager was supposed to work for Hacienda, under the Management Agreement, Starwood decided that an "elegant removal" of Hacienda – or the "transition plan" – could be accomplished through replacing the General Manager with one of their own choosing who it would control.

45. But the Keys report was a pretext for replacing Hacienda's General Manager; Starwood had started the process of finding a new General Manager three weeks before even retaining Keys and almost two months before Keys issued his report. On August 19, 2009, a representative of the Boutique Search Firm emailed Jacobs and Schwaegler an agreement for the "General Manager search at [the Project]. . . . I look forward to working with you and Dan Schwaegler on this exciting assignment."[53] Accordingly, it is clear that the Keys report was the very definition of pretext – it was used to justify, after the fact, a decision that Starwood had already made.

[51] *See* Exhibit 32.

[52] *See* Exhibit 24.

[53] *See* Exhibit 25.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

46. Under false pretenses, Starwood approached Hacienda about replacing the then-current General Manager. Wanting to be cooperative, Hacienda agreed to the replacement of the then-current General Manager by a general manager of Starwood's choosing in light of the fact that by the fall of 2009, Starwood had made clear that its vision for the Project was changing from that originally envisioned by Desarrollo. But there was no discussion with Hacienda regarding Starwood's intent to misappropriate the General Manager position (which was vital to Hacienda's ability to perform under the Management Agreement) once a new General Manager was put in place.

47. In fact, on November 5, 2009 Schwaegler emailed Hatfield to inform him that Starwood had selected a new General Manager, misrepresenting Starwood's intent to misappropriate the General Manager Position, as well as the reason for hiring Keys.[54] Schwaegler wrote to Hatfield that the new General Manager "will be a great fit for the property and will go a long way towards helping us achieve our property positioning and operating goals."[55] Of course, Schwaegler knew this statement was false when he made it to Hatfield, as the new General Manager was nothing more than the first step of "elegantly removing" Hacienda. In addition, consistent with his previous oral statements to Hatfield regarding Keys, Schwaegler represented to Hatfield that he had engaged Keys to make suggestions on the Project and to "immediately . . . begin work on the priorities outlined in his memo."[56] As discussed above, this statement is false because Keys was hired to justify Starwood's misappropriation of the General Manager position and to assist in terminating Hacienda.

[54] *See* Exhibit 26.

[55] *See id.*

[56] *See id.*

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

**VII. Starwood installs Ricardo Ramirez as General Manager, in violation of the Management Agreement, and proceeds with its transition plan, ultimately causing Hacienda's termination.**

48. On or about November 16, 2009, Starwood inserted their own General Manager, Ricardo Ramirez, at the Project and thereafter began to assert complete control over the General Manager position. Rather than reporting to Hacienda, as required by the Management Agreement, Ramirez was a Starwood employee who was supervised by, and took direction from, Starwood.[57] Starwood's misappropriation of the General Manager position made it unreasonably difficult for Hacienda to fulfill its contractual obligations under the Management Agreement, as the General Manager was Hacienda's primary means of managing and operating the Project on a daily basis.

49. Starwood's internal communications, both before and after Starwood installed Ramirez as General Manager, establish that the change in General Managers was solely due to Starwood's desire to save money by terminating Hacienda – and not due to any operational deficiencies on the part of Hacienda. As discussed above, Schwaegler told McCarthy shortly before hiring Ramirez that hiring its own General Manager was Starwood's "first step" in the process of "elegant[ly] remov[ing]" Hacienda.

50. Similarly, about a week after Ramirez was hired, on November 24, 2009, McCarthy instructed Schwaegler and Hiltscher that "[w]e have to reduce the burn at Hacienda. Lots of payments to all sorts of good vendors, but have we attacked the costs to be as frugal as possible?"[58] After Schwaegler responded that the issue was a "high priority," McCarthy responded that "we can't pay Hatfield the developer's fee we agreed to in yesterday's world. What's the strategy to get it

[57] *See* Exhibit 27.

[58] *See* Exhibit 28.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

dramatically reduced, and how can I help accomplish that?"[59] Schwaegler replied, "We are working through the game plan on this one. Very tricky as you [k]now. We have engaged in discussions with a target of year-end change in scope of work and fee, but I want Ricardo [Ramirez] to get me his thoughts before I go down this path because I may want to structure a transition that puts Hatfield completely out sometime next year. I want a well thought out strategy where I am comfortable with the end result and that includes what we are capable of doing w[ith] Ricardo in place (thus want his input). Many different routes to go and I don't want to bring you into the fray until I get you the full game plan."[60]

51. Of course, if one were acting in a forthright manner, there would not be anything "very tricky" about terminating a contract in a manner consistent with the terms of the contract. But being "very tricky" appears to have been Starwood's standard operating procedure with respect to Hacienda.

52. Initially, the game plan was to have Desarrollo buy out the Management Agreement with Hacienda. In January 2010, Owner attempted to negotiate an agreed buyout of Operator's Management Agreement. A January 8, 2010 Starwood Weekly Asset Management Report, which included Sternlicht, McCarthy, Dishner, and other senior executives, reveals that Starwood was seeking to negotiate a buy-out with Hatfield removing him from direct responsibility for operations and making him a lesser paid consultant with a target of $100,000 per year cost versus the current cost of $600,000 per year.[61] Interestingly, this Weekly Asset Management Report referenced no complaints about Hacienda's performance, merely stating the goal of a $500,000 yearly cost reduction. On or about January 12, 2010, Hatfield and David Bruce of Hacienda met with

[59] *See id.*

[60] *See id.*

[61] *See* Exhibit 29.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

Schwaegler and Kevin Lee, a Starwood asset manager, at Starwood's San Francisco office, where Schwaegler and Lee both worked, to negotiate an agreed buyout of the Management Agreement. When these buyout negotiations failed, Starwood turned to the final step in its "game plan," by, once again, resorting to deceitful and tortious conduct.

53. Turning to Ramirez, the General Manager over whom Starwood had secretly and wrongfully asserted control, as well as to the consultants that it previously employed to carry out its "transition plan," Starwood concocted an extensive list of baseless breaches of the Management Agreement by Hacienda and used these alleged breaches as the pretext it needed to cause Desarrollo to terminate the Management Agreement.

54. First, Schwaegler tasked his handpicked General Manager and Starwood employee, Ramirez, to draft a list of alleged breaches, which Ramirez complied in a memorandum dated January 6, 2010.[62] Ramirez's memorandum contained an extensive list of issues that he claimed to have observed at the Project since his arrival as General Manager on November 16, 2009.[63] But Ramirez specifically advised Schwaegler that "[m]any of these issues have been resolved or addressed recently" and that "most of these points are currently being addressed or in the process of being corrected."[64] As such, these alleged breaches hardly amounted to a "material adverse effect on the operation of the Project," as required to constitute a default under Section 11.1.5 of the Management Agreement, notwithstanding the fact that the same section of the Management Agreement also contained a thirty-day cure provision. Despite the fact that the Management Agreement mandated that the General Manager worked for, and answered to, Hacienda, Ramirez did

[62] *See* Exhibit 30.

[63] *See id.*

[64] *See id.*

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

not share this memorandum with Hacienda. For their part, Hall and Keys were also involved in assisting Starwood in manufacturing alleged breaches against Hacienda.[65]

55. Later that same month, Schwaegler submitted a proposed draft of a default letter to Ramirez and Hall.[66] The vast majority of the claimed breaches set forth in this draft were the same items contained in Ramirez's January 6, 2010 memorandum to Schwaegler, despite Ramirez having previously advised Schwaegler that many/most of the items had been "resolved," "addressed," or were "in the process of being corrected."[67] In response, Hall and Ramirez both advised Schwaegler of certain inaccuracies in the default letter, but these protests did not stop Schwaegler, who ignored their comments and sent the default letter on January 28, 2010 with the inaccuracies.[68]

56. The January 28, 2010 letter contained 49 alleged breaches, many of which were as trivial as a lack of first aid kits in back of house areas, typographical errors in written materials, failing to maintain headsets in the fitness center, and a lack of umbrellas and rain shields for golf carts.[69]

57. Notwithstanding the trivial nature of Schwaegler's alleged breaches, the more fundamental issue was that the notice of breach letter was merely pretextual in nature and lacked any merit in the first place. In response, pursuant to the Management Agreement's cure provision, Hacienda painstakingly responded to the merits of each and every alleged breach, either offering a

[65] *See* Exhibit 31; Exhibit 32; Exhibit 33.

[66] *See* Exhibit 33; Exhibit 34.

[67] *See id.*

[68] *See* Exhibit 35.

[69] *See id.*

direct explanation as to why the alleged breach was not true, or requesting additional information so that any legitimate issue could be cured within thirty days.[70]

58. In response to Hacienda's letter responding to the breach allegations and requesting additional information, Desarrollo simply terminated the Management Agreement based on the pretextual reasons contained in Schwaegler's notice of breach letter, in clear violation of the Management Agreement's termination and cure provisions.[71]

59. Starwood's misrepresentations regarding the reasons for hiring Keys and Ramirez, induced Hacienda to consent to Ramirez's hiring as General Manager and to reassign the Hacienda employee who was then serving as General Manager. The truth was that Starwood hired Keys and Ramirez for the specific purpose of misappropriating the General Manager position in order to manufacture reasons to terminate Hacienda and that Schwaegler's 49 claimed breaches were a farce. Had Hacienda known the truth, it never would have agreed to Ramirez's hiring.

60. To date, neither Starwood nor Desarrollo has engaged a replacement management company following Hacienda's termination, electing to manage the Project entirely in-house, as contemplated by Hall's March 22, 2009 report to Schwaegler that discussed Starwood's "opportunity to regain total daily control of the development by removing the general partner and placing appropriate infrastructure to manage and oversee the asset in house."[72]

61. On August 20, 2010, Hacienda initiated an arbitration proceeding against Desarrollo, asserting a breach of contract claim, pursuant to the Management Agreement's arbitration provision. Desarrollo asserted a breach of contract counterclaim against Hacienda. After conducting discovery, the parties commenced an arbitration hearing on October 3, 2011. On October 4, 2011, without

---

[70] *See* Exhibit 36.

[71] *See* Exhibit 37.

[72] *See* Exhibit 19.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

having concluded the hearing, the parties mutually agreed to withdraw their claims. On October 14, 2011, the arbitration panel issued an award reflecting the mutual withdrawal of the arbitration claims.[73]

62. All conditions precedent to the filing of this petition and the recovery of the damages requested herein have occurred or have been performed.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION-- Tortious Interference with Contract

63. Hacienda realleges and incorporates by references the preceding paragraphs.

64. Hacienda entered into a valid, binding twenty-year contract with Desarrollo. Starwood was aware of the Management Agreement. Starwood took intentional acts and employed wrongful means specifically designed to cause a breach of the Management Agreement and/or to cause the disruption of Hacienda's contractual relationship by, without limitation: (1) causing the breach of the Term Sheet's exclusivity provision, (2) negotiating the terms of the Management Agreement in bad faith, (3) fraudulently inducing Hacienda to enter into the Management Agreement, (4) causing Desarrollo to act in bad faith, (5) misappropriating the General Manager position in violation of the Management Agreement, and (6) inducing Desarrollo to terminate the Management Agreement based on the false, pretextual reasons concocted by Schwaegler, the

[73] *See* Exhibit 38. The prior arbitration proceeding against Desarrollo does not have any preclusive effect on Hacienda's claims in this action against Starwood. A district court sitting in diversity applies the forum state's law regarding the preclusive effect of an arbitration on a subsequent claim against a third party. *Jacobs v. CBS Broadcasting, Inc.*, 291 F.3d 1173, 1177 (9th Cir. 2002). Under California law, "a private arbitration award, even if judicially confirmed, can have no collateral estoppel effect in favor of third persons unless the arbitral parties agreed, in the particular case, that such a consequence would apply." *Vandenburg v. Superior Court*, 21 Cal. 4th 815, 834 (1999). No such agreement exists in this case. And for the doctrine of res judicata to have any preclusive effect, there must have been a final arbitration judgment on the merits. *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 896-97 (2002) ("'Res judicata' describes the preclusive effect of a final judgment on the merits."). A voluntary dismissal of a prior action is not a final decision on the merits because "nothing was 'actually litigated' or 'necessarily decided' in that action, even though the dismissal with prejudice [was] 'on the merits.'" *Le Parc Cmty. Ass'n v. Workers' Comp. Appeals Bd.*, 2 Cal. Rptr. 3d 408, 419 (2003) (holding that voluntary dismissal of an action before trial pursuant to the parties' settlement agreement did not preclude a later suit on the same issue from the dismissed action).

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

misappropriated General Manager, and other consultants hired by Starwood.[74] Starwood not only clearly communicated its intention to interfere with Hacienda's contract rights internally, within Starwood's high level of senior management, but also communicated its intentions to third party consultants, Hall and Keys, that Starwood engaged to assist it in its interference.

65. Starwood's intentional acts and wrongful means made it more difficult and costly for Hacienda to perform its obligations under the Management Agreement and ultimately caused Desarrollo to wrongfully terminate the Management Agreement, in breach of the termination and cure provisions. Starwood's intentional acts and wrongful means have caused monetary damages to Hacienda in the form of lost fees under the Management Agreement, among other things.

## SECOND CAUSE OF ACTION—Fraud and Aiding and Abetting Fraud and Fraudulent Inducement.

66. Desarrollo and/or Starwood fraudulently induced Hacienda to enter the Management Agreement by making misrepresentations of fact and/or by making promises without any intention of performing them. Desarollo and/or Starwood led Hacienda to believe, through false representations, that Desarollo was committed to Hacienda as the Project's manager and operator when it had no intent of performing its contractual obligations. These false representations include, without limitation: (1) the May 14, 2008 Term Sheet in which Desarrollo represented that it would "negotiate exclusively" with Hacienda and its affiliates and that Desarrollo would negotiate in "good faith," (2) Starwood Senior Vice-President for Asset Management Schwaegler's representation to

---

[74] The fact that Starwood is the principal owner/parent of Desarrollo, without more, does not "make their intentional interference with a contract of [Desarrollo] privileged as a matter of law – that is, privileged under all conceivable circumstances." *Culcal Stylco, Inc. v. Vornado, Inc.*, 26 Cal. App. 3d 879, 883 (1972). At most, a qualified privilege exists, dependent upon the circumstances of the case, pursuant to Section 769 of the Restatement of Torts, that requires that the defendant both did not employ improper means and that it acted to protect its interest from being prejudiced by the relation. *Id.* at 882-83; RESTATEMENT (SECOND) OF TORTS § 769. This privilege is an affirmative defense that must be pleaded and proved. *Woods v. Fox Broadcasting Sub., Inc.*, 129 Cal. App. 4th 344, 356 (2005). "It is essentially a state-of-mind privilege, and therefore its existence cannot normally be satisfactorily determined on the basis of pleadings alone." *Culcal*, 26 Cal. App. 3d at 883. "Thus, the question on the issue of privilege is a question for the trier of fact." *GHK Assoc. v. Mayer Group, Inc.*, 224 Cal. App. 3d 856, 883 (1990).

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

Hatfield, in a November 12, 2008 email, that Desarrollo/Starwood was acting in "good faith," and (3) Schwaegler's November 20, 2008 representation to Hatfield that "We are prepared to move forward with the [management] agreement. [W]e all feel that we need to keep everyone's focus 100% moving forward and so we are prepared to execute the management agreement and guaranty now."

67. Each of these statements were knowingly false when made. Starwood and/or Desarrollo made each of these statements with an intent to deceive or induce reliance on the part of Hacienda. Starwood not only clearly communicated its intention to defraud Hacienda and aid and abet Desarrollo's fraud internally, within Starwood's high level of senior management, but also communicated its intentions to third party consultants, Hall and Keys, that Starwood engaged to assist it in its fraudulent scheme.

68. Hacienda justifiably relied on these statements by agreeing to enter into the Management Agreement. Hacienda suffered damages as a result of Desarrollo's and/or Starwood's fraudulent statements, including, but not limited to, lost management fees under the Management Agreement caused by the unlawful termination.

69. Desarrollo and/or Starwood also made additional false representations to Hacienda after they fraudulently induced Hacienda to enter into the Management Agreement. These false representations include, without limitation: (1) Schwaegler's and Keys's November 2009 oral statements to Hacienda's principal Ron Hatfield representing that Keys was hired to assist all parties in finding ways to improve the Project, (2) Schwaegler's representation in a November 5, 2009 email that as the new General Manager Ramirez "will be a great fit for the property and will go a long way towards helping us achieve our property positioning and operating goals," (3) Schwaegler's representation in a November 5, 2009 email that he had engaged Keys to make suggestions on the Project and to "immediately . . . begin work on the priorities outlined in his

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

memo," (4) Schwaegeler's January 28, 2010 Notice of Breaches letter, and (5) Schwaegler's April 1, 2010 Termination letter.

70.     Each of these statements were knowingly false when made.  Starwood and/or Desarrollo made each of these statements with an intent to deceive or induce reliance on the part of Hacienda.  Hacienda justifiably relied on these statements by agreeing to the switch in General Managers, which it would not have accepted had it known the truth. Hacienda suffered damages as a result of Desarrollo's and/or Starwood's fraudulent statements, including, but not limited to, lost management fees under the Management Agreement caused by the unlawful termination.

71.     Starwood provided substantial assistance to Desarollo's fraud against Hacienda by, among other things, hiring Bill Hall, Duffy Keys, and Ricardo Ramirez, as well as tasking Starwood senior management, to engage in deceitful conduct calculated to cause Hacienda's termination, all at the behest of Starwood with knowledge that Desarrollo was breaching its duties to Hacienda.

**THIRD CAUSE OF ACTION—Aiding and Abetting Tortious Breach of the Duty of Good Faith and Fair Dealing**

72.     Two valid and enforceable contracts existed between Desarrollo and Hacienda: the Term Sheet and the Management Agreement.  Desarrollo, with Starwood's assistance, engaged in tortious conduct that injured Hacienda's right to receive the benefits of the contracts, including, but not limited to: (1) breaching the Term Sheet's exclusivity provision, (2) negotiating the terms of the Management Agreement in bad faith, (3) fraudulently inducing Hacienda to enter into the Management Agreement, (4) performing the Management Agreement in bad faith, and (5) terminating the Management Agreement in bad faith based on the false, pretextual reasons concocted by Schwaegler, the misappropriated General Manager, and other consultants hired by Starwood. Starwood not only clearly communicated its intention to aid and abet Desarrollo's bad faith conduct

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

internally, within Starwood's high level of senior management, but also communicated its intentions to third party consultants, Hall and Keys, that Starwood engaged to assist it in its tortious scheme.

73. Starwood had knowledge of the two contracts between Desarrollo and Hacienda. Starwood provided substantial assistance to Desarollo's breach of its duty of good faith and fair dealing against Hacienda by, among other things, hiring Bill Hall, Duffy Keys, and Ricardo Ramirez, as well as tasking Starwood senior management, to engage in deceitful conduct calculated to cause Hacienda's termination, all at the behest of Starwood with knowledge that Desarrollo was breaching its duties to Hacienda.

**Exemplary Damages**

74. Starwood's actions in intentionally interfering with Hacienda's contract with Desarrollo and committing fraud against Hacienda, including fraudulently inducing Hacienda to enter into a long-term contract with Desarrollo and engaging in deception and knowing misappropriation of the General Manager's position constitute wanton, malicious conduct for which punitive damages should be awarded. Starwood's knowingly wrongful conduct is without justification and fails to comport with applicable notions of fair play and the good faith standard to which Starwood should be held.

75. In addition, Starwood's conduct is not an isolated incident but is symptomatic of a pattern of conduct whereby Starwood induced parties to provide their services and then induced Desarrollo to breach its contracts with those parties when Starwood believed that such services were no longer needed by Desarrollo. Such conduct should be punished so as to discourage Starwood from engaging in similar future wanton and malicious conduct.

**PRAYER FOR RELIEF**

Hacienda Management, S. De R.L. De C.V. respectfully requests that Defendants Starwood Capital Group Global I, LLC, Starwood Global Opportunity Fund VI-A, Starwood Global

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104

Opportunity Fund VI-B, SOF-VI Management, LLC, and Starwood Capital Group Management, LLC be cited to appear and answer herein, and that upon final trial:

a. Judgment be entered in favor of Plaintiff and against Defendants jointly and severally in the amount of the damages caused by Defendants' tortious interference with Plaintiff's contract with Desarrollo;

b. Plaintiff be awarded exemplary damages as a result of Defendants' wanton, malicious, and unjustified conduct;

c. Plaintiff be awarded pre-judgment and post-judgment interest on the foregoing awards at the maximum rate(s) allowed by law; and

d. Plaintiff recover such other and further relief, at law or in equity, to which Plaintiff may show itself justly entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff Hacienda Management, S. De R.L. De C.V. hereby demands trial by jury.

Dated: January 24, 2012

Respectfully submitted,

LOCKE LORD LLP

By: ______________________
Regina J. McClendon

Attorneys for Plaintiff
HACIENDA MANAGEMENT, S. DE R.L. DE C.V.

Locke Lord LLP
44 Montgomery Street, Suite 2400
San Francisco, CA 94104